IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

KAUFMAN V. KAUFMAN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

TIMOTHY KAUFMAN, APPELLANT,

V.

JEFFREY KAUFMAN AND MICHAEL KAUFMAN, APPELLEES.

Filed August 6, 2024.    Nos. A-23-963, A-23-964.

Appeals from the District Court for Scotts Bluff County: LEO P. DOBROVOLNY, Judge. Affirmed.

Robert M. Brenner, of Robert M. Brenner Law Office, for appellant.

Sterling T. Huff, of Sterling T. Huff Attorney at Law, P.C., L.L.O., for appellees.

PIRTLE, Chief Judge, and ARTERBURN and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

In these consolidated appeals, Timothy Kaufman appeals from the Scotts Bluff County District Court's order dismissing his petitions for domestic abuse protection orders against Jeffrey Kaufman and Michael Kaufman. For the reasons stated herein, we affirm.

## II. STATEMENT OF FACTS

### 1. BACKGROUND

Timothy, Jeffrey, and Michael are brothers, shareholders of a family farming corporation, and have worked together for 40 years. The brothers reside in separate homes, and have separate sheds, on their family farm.

The brothers agree that things between them turned heated on the morning of August 9, 2023. That morning began normally with the brothers meeting to discuss their work plan for the

- 1 -

day. They decided to retrieve some semi-trucks from Timothy's shed and take them to Michael's shed to perform repairs. Jeffrey and his son, Austin, went to Timothy's shed and each drove a truck back to Michael's shed with Timothy following in his own vehicle. Upon entering Michael's shed, Timothy dropped either a peanut or pistachio on the floor. For consistency, we will refer to the dropped nut as a peanut. A verbal altercation then ensued followed by Michael allegedly hitting the back of Timothy's head with his fist and Jeffrey allegedly strangling Timothy. During the incident, Jeffrey and Michael also allegedly threatened Timothy stating things like "you just need to die" and "kill that fucker." After the incident, the parties continued to work together for the remainder of the day.

Two days after the incident, Timothy was treated at an emergency room. Medical records indicate that Timothy was treated for a concussion and whiplash injury, he received referrals for physical therapy and chiropractic care, and that Timothy declined a referral to neurology.

### 2. PETITIONS AND AFFIDAVITS FOR DOMESTIC ABUSE PROTECTION ORDERS

On August 15, 2023, Timothy filed separate petitions and affidavits to obtain domestic abuse protection orders against his brothers, Michael and Jeffrey.

Timothy's affidavit regarding Jeffrey set forth that, following a verbal altercation, Jeffrey "attacked" him by "grabbing me with both of his hands around my neck and violently shaking me" for several minutes. Timothy stated that during this period of time, Jeffrey yelled and cursed at him. After Jeffrey released him, Michael "assaulted" him, followed by Jeffrey "strangling me again" while saying "you're fucking dead because I hate you" and "you just need to die." After several minutes, Jeffrey released Timothy but continued his verbal tirade, including yelling "kill that fucker" and saying that Timothy was "a stupid motherfucker and an ass." Timothy also indicated that he felt "worried" and "scared they will do it again."

Timothy's affidavit in support of a domestic abuse protection order against Michael averred that after Timothy "accidently dropped a [peanut] on the shed floor," Michael told him to "pick up that fucking [peanut]" to which Timothy responded, "fuck you." Jeffrey then assaulted Timothy during which Michael said, "I'd like to kill you too mother fucker." After Jeffrey released Timothy, Michael continued to yell at Timothy calling him "a fucking prick." Michael then picked up the peanut and "punched me in the back of the head with his fist and shoved the peanut in my pocket." Jeffrey then began strangling Timothy again with Mike stating multiple times "you just need to die." Michael also called Timothy "a stupid mother fucker and an ass." Timothy again stated that he felt "worried" and "scared they will do it again."

### 3. SHOW CAUSE HEARING

A combined show cause hearing was held in September 2023. Testimony was adduced from Timothy; Jeffrey; Michael; Scotts Bluff County Sheriff's Deputy Dominick Peterson; and Austin Kaufman, Jeffrey's son. Timothy's medical record from a September 2023 follow-up visit was admitted into evidence.

### (a) Timothy's Testimony

Timothy testified that on the day of the incident, he started an audio recording on his phone prior to entering the shed, due to past experiences with his brothers. Timothy testified that as he entered the shed, he

> had a hand full of peanuts in my hand when I walked into the shed and I accidentally dropped one. And, [Michael] told me to pick up the peanut. I told him to F off. And, right at that time [Jeffrey] . . . [came] at me and . . . he put both hands around my throat and started strangling me.

Timothy testified that Jeffrey continued strangling him until Austin put his hands on Jeffrey's shoulders, after which Timothy was able to push back and then Jeffrey let go. Timothy stated that Michael picked up the peanut, then approached him with the peanut in his left hand and his right hand in a fist. Michael then "stuck that peanut in my pocket . . . and then he hit me on the back of his head with his fist and he said here is your fucking peanut." After Michael hit the back of Timothy's head, Jeffrey "grabbed my throat again . . . and started choking me." Timothy stated that during the altercation his brothers said that they wanted to kill him.

Timothy testified that he was afraid of his brothers and that he received a notice of termination of his employment threatening to fire him if Timothy failed to dismiss his petition. Timothy stated that based upon past experiences with his brothers, a similar event would occur because his brothers have stated that they wanted to kill him.

### (b) Austin's Testimony

Austin testified that the altercation occurred after Timothy used vulgar language and "was throwing [peanuts] on the ground and we had cleaned the shop up earlier during the day." Austin testified that when Michael told him to pick up the peanut, Timothy "said F you and that's when he shoved - - he came at [Michael] and shoved [Michael]." Austin testified that as the situation escalated, Jeffrey grabbed Timothy with his left hand, twisted Timothy's shirt, and pushed Timothy off of Michael. At that point, Austin grabbed Jeffrey's shoulder and right arm because "I didn't want anything to happen to anybody."

According to Austin, Jeffrey did not choke Timothy and Michael did not strike Timothy, but there was a "whole lot of hollering and screaming and then [Michael] picked up the . . . peanut casing. . . and then he threw it back and put it back in [Timothy's] pocket and said, there you go." After the situation deescalated, Austin testified that they continued to work as normal and there was no indication that Timothy was injured or scared as a result of the incident.

### (c) Jeffrey's Testimony

Jeffrey testified similarly stating that after Timothy shoved Michael, he attempted to deescalate the situation. Jeffrey testified that he grabbed Timothy by the shirt collar and held him and pushed him away from Michael. Jeffrey denied strangling Timothy or witnessing Michael hit Jeffrey.

### (d) Michael's Testimony

Michael's testimony was consistent with the testimony adduced by Jeffrey and Austin.

## (e) Audio Recording of Incident

In the audio recording of the incident, which was received into evidence, Michael can be heard stating, "I would like to kill you, you mother fucker." Michael testified he did not remember saying that or remember Timothy saying, "get off me." Michael denied hitting Timothy at any point during the incident but acknowledged that he did put a peanut in Timothy's pocket and said, "here is your fucking peanut." In the audio recording of the altercation, Jeffrey could be heard stating, "you're fucking dead because I fucking hate you motherfucker," and telling someone to "kill the fucker." Jeffrey testified that he did not recall making those statements but indicated that it was a "heated moment."

## (f) Deputy Peterson's Testimony

Deputy Peterson testified that after Timothy reported the alleged assault, he interviewed Timothy, Jeffrey, Michael, and Austin, with each interview captured on his body worn camera. The footage from the body camera was offered and received into evidence during the hearing. Peterson testified that during Timothy's interview, Timothy did not appear afraid or emotional, but he did recount a previous incident separate from the August 9, 2023, incident. Peterson testified that he did not observe any injuries on Timothy and noted some concerns about inconsistencies between Timothy's report and the video recording. During Jeffrey and Michael's interviews, they admitted arguing with Timothy but denied that any physical altercation occurred. And during Austin's interview, he indicated to Deputy Peterson that Jeffrey grabbed Timothy by the collar and that they had an argument over something that Timothy had said under his breath.

## (g) Exhibits Offered by Jeffrey and Michael

During the show cause hearing, Jeffrey and Michael offered the following exhibits into evidence: the minutes from a shareholder and director meeting from December 2020, the notice of annual and/or special shareholder's meeting, the notice of termination of lease and/or occupancy to Timothy and his family, a USB drive which contained audio recordings that Timothy provided to law enforcement, and a verified statement of the informal closing of their mother's estate. Timothy objected to all of these exhibits on the basis of their lack of relevancy to the protection order proceedings. The court received the exhibits into evidence indicating that the court would have to review the evidence to determine if it was relevant and, for at least one of the exhibits, that the court would "make comments in my opinion if I think it's of limited or no relevance to the decision."

## 4. DISTRICT COURT ORDER

Following the hearing, the district court denied both of Timothy's requests for domestic abuse protection orders and dismissed his petitions. Specifically, the court found in both cases that Timothy did not meet his burden to establish by a preponderance of the evidence the truth of the facts alleged in his petitions. Specifically, the court found in each case that

> The evidence does not show domestic abuse, as defined by the law, has occurred, or that [Timothy] is reasonably in fear that it will occur in the future. The evidence shows primarily verbal disagreements which escalate into shouting matches, but the evidence does not show [that Michael or Jeffrey respectively] has caused or intentionall[y] and

knowingly caused bodily injury to [Timothy], or that [Timothy] is reasonably in fear of bodily injury by means of a credible threat.

Timothy has timely appealed to this court.

### III. ASSIGNMENTS OF ERROR

Timothy assigns, consolidated and restated, that the district court erred in: (1) denying his requests for domestic abuse protection orders on the basis that he failed to satisfy his burden to prove abuse had occurred under Neb. Rev. Stat. § 42-903(1)(a) and (b) (Cum. Supp. 2022); (2) failing to consider and determine that the evidence was sufficient to issue a harassment protection order; and (3) failing to include findings in its orders on the relevance and application of various exhibits received during the show cause hearing.

### IV. STANDARD OF REVIEW

A protection order pursuant to Neb. Rev. Stat. § 42-924 (Reissue 2016) is analogous to an injunction. *Garrison v. Otto*, 311 Neb. 94, 970 N.W.2d 495 (2022). Thus, the grant or denial of a protection order is reviewed de novo on the record. *Id.* In such de novo review, an appellate court reaches conclusions independent of the factual findings of the trial court. *Id.* However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

### V. ANALYSIS

#### 1. DENIAL OF PROTECTION ORDER

Timothy first assigns that the district court erred in denying his request for domestic abuse protection orders against Jeffrey and Michael. He contends that the evidence adduced at the show cause hearing established that he was "a victim of abuse" and that Jeffrey and Michael's actions in "intentionally grab[bing] [him] by the neck shirt collar, twisting it which strangles the neck, then pushing [Timothy] back causing impeded normal breathing or circulation of the blood, wherein Tim[othy] became light-headed, all while making statements threatening to kill Tim[othy]" constituted a credible threat. Brief for appellant at 15.

A show cause hearing in protection order proceedings is a contested factual hearing, in which the issues before the court are whether the facts stated in the sworn application are true. *Hawkins v. Delgado*, 308 Neb. 301, 953 N.W.2d 765 (2021). A protection order is analogous to an injunction. *Id.* A party seeking an injunction must establish by a preponderance of the evidence every controverted fact necessary to entitle the claimant to relief. *Id.*

In *Garrison v. Otto*, 311 Neb. 94, 103-04, 970 N.W.2d 495, 502-03 (2022), the Nebraska Supreme Court stated

> Under the Protection from Domestic Abuse Act, "[a]ny victim of domestic abuse" may seek a domestic abuse protection order. Subsection (1)(b) of § 42-924 provides that the "petition for a protection order shall state the events and dates or approximate dates of acts constituting the alleged domestic abuse, including the most recent and most severe incident or incidents."

In the context of a court's deciding whether to affirm or rescind the initial ex parte protection order, we have held that whether domestic abuse occurred is a threshold issue, and absent abuse as defined by § 42-903, a protection order may not remain in effect. "Abuse" is statutorily defined as the occurrence of one or more of the following acts between family or household members: (1) attempting to cause or intentionally and knowingly causing bodily injury with or without a dangerous instrument; (2) placing, by means of credible threat, another person in fear of bodily injury, or (3) engaging in sexual contact or sexual penetration without consent as defined in Neb. Rev. Stat. § 28-318 (Cum. Supp. 2020). Family or household members includes former spouses.

We have also held, in the context of a court's decision to affirm or rescind an initial ex parte protection order, that a finding that domestic abuse has occurred does not end a court's inquiry. In *Maria A. on behalf of Leslie G. v. Oscar G.*, we explained that the goal of domestic abuse protection orders is to protect victims of domestic abuse from further harm. Thus, the court must conduct a wider inquiry that weighs the likelihood of future harm to the petitioner in light of all the surrounding circumstances. We noted that we have repeatedly analogized domestic abuse protection orders to injunctions, which sound in equity. And injunctions are not meant to punish past actions but to prevent future mischief. On a consideration of all the circumstances of each case, the court, before issuing an injunction, weighs the burdens the order will inflict against its benefits.

We accordingly held that in considering whether to continue an ex parte domestic abuse protection order following a finding that domestic abuse has occurred, a court is not limited to considering only whether the ex parte order was proper, but may also consider a number of factors pertinent to the likelihood of future harm. Those factors might include, but are not limited to, the remoteness, severity, nature, and frequency of past abuse; past or pending credible threats of harm; the psychological impact of domestic abuse; the potential impact on the parent-child relationship; and the nuances of household relationships. With respect to the factor of remoteness, we have observed that the statutory scheme does not impose any limitation on the time during which a victim of domestic abuse may file a petition and affidavit seeking a protection order after the abuse.

Here, Timothy argues that the evidence presented at trial was sufficient to show abuse as defined in § 42-903(1)(a) attempting to cause or intentionally and knowingly causing bodily injury with or without a dangerous instrument and (b) placing, by means of credible threat, another person in fear of bodily injury. He contends that the evidence presented showed that Jeffrey and Michael assaulted him as defined under Neb. Rev. Stat. § 28-310.01 (Cum. Supp. 2022) (assault by strangulation or suffocation) causing him to suffer a concussion thereby satisfying his burden to prove abuse under § 42-903(1)(a) and that Michael and Jeffrey's threats regarding killing him amounted to credible threats under § 42-903(1)(b) which placed him in fear for his safety. We disagree.

Although Timothy asserted that Michael and Jeffrey intentionally and knowingly caused bodily injury to him when Jeffrey strangled Timothy and Michael hit Timothy, that testimony was disputed by Michael, Jeffrey, and Austin.

And, as it relates to his claim that the evidence was sufficient to prove abuse by means of a credible threat, Jeffrey argues that Jeffrey and Michael threatened to kill him which made him fear for his safety.

Neb. Rev. Stat. § 42-903(1)(b) provides, in pertinent part, that:

For purposes of this subdivision, credible threat means a verbal or written threat, including a threat performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct that is made by a person with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family. It is not necessary to prove that the person making the threat had the intent to actually carry out the threat. . . .

The "credible threat" language in § 42-903 means that the evidence at trial must include some threat of intentional physical injury or any other physical threat. *Linda N. v. William N.*, 289 Neb. 607, 856 N.W.2d 436 (2014).

Timothy argues that the statements made by Jeffrey and Michael are sufficient to show a credible threat as defined by § 42-903. During the altercation, Jeffrey and Michael made various statements to Timothy about killing him. Jeffrey told Timothy, "You're fucking dead," and said, "kill the fucker." When asked why he made those statements, Jeffrey stated that "it was a heated moment, family deal and everybody said stuff that it's just not meaningful" and that "when you work with your brother for 40 years, you know what can set the other person off." At one point during the altercation, Michael also appears to have said, "I would like to kill you too, you motherfucker."

The evidence reflects that Deputy Peterson did not observe any injuries or bruising on Timothy and that although Timothy appeared "frustrated" and "angry," he did not otherwise appear scared or in fear for his safety. Further, Timothy acknowledged that immediately after the incident, he continued working with both Jeffrey and Michael. Based on this evidence, we do not find that the evidence was sufficient to prove that there was a credible threat so as to cause Timothy to reasonably fear for his safety.

Therefore, in light of the weight given to the district court's credibility determinations, and in finding that there was no credible threat causing Timothy to reasonably fear for his safety, we find that the court did not err in finding that the evidence was insufficient to establish either abuse or a credible threat as defined under § 42-903.

### 2. FAILURE TO ISSUE HARASSMENT PROTECTION ORDERS

We next address Timothy's claim that the district court erred in not alternatively issuing a harassment protection order. Nebraska courts have found harassment protection orders to be appropriate when the perpetrator stalks, follows, detains, restrains, or otherwise harasses the victim on several separate occasions. *Knopik v. Hahn*, 25 Neb. App. 157, 902 N.W.2d 716 (2017). Here, there was no evidence showing several separate occasions, or a pattern or course of conduct, of any type of behavior by Jeffrey or Michael. Therefore, having failed to prove harassment, the district court did not err in failing to alternatively issue a harassment protection order.

### 3. EVIDENTIARY ISSUES

Timothy's third assignment of error is that the district court erred in failing to address the relevancy and application of several exhibits received during the show cause hearing, including the minutes from a shareholder and director meeting from December 2020, a notice of annual and/or special shareholder's meeting, a notice of termination of lease and/or occupancy to Timothy and his family, a USB which contained audio recordings that Timothy provided to law enforcement, and a verified statement of an informal closing of their mother's estate. He argues that the district court indicated during the show cause hearing that it would address the relevance and application of the particular exhibits in its order but failed to do.

Pursuant to Neb. Rev. Stat. § 25-1127 (Reissue 2016):

> Upon the trial of questions of fact by the court, it shall not be necessary for the court to state its finding, except, generally, for the plaintiff or defendant, unless one of the parties request it, with a view of excepting to the decision of the court upon the questions of law involved in the trial; in which case the court shall state in writing the conclusions of fact found separately from the conclusions of law.

Here, because there was no request by any of the parties for the court to make specific findings, the court was not obligated to do so. Further, even if such request had been made, in equity actions, the absence of statements concerning a trial court's findings of fact and conclusions of law, even when requested, is not prejudicial, because an appellate court, in a de novo review of the record, reaches a conclusion independent of any findings by the trial court. See *Fee v. Fee*, 223 Neb. 128, 388 N.W.2d 122 (1986). This assignment of error fails.

### VI. CONCLUSION

Having considered and rejected Timothy's assigned errors, the district court's denial of his request for domestic abuse protection orders is affirmed.

AFFIRMED.